# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**STANLEY L. FELTON, SR.,**

> **Plaintiff,**

> **v.**                                              **Case No. 22-CV-1352-SCD**

**STEVEN JOHNSON,**
**BRET MIERZEJEWSKI,**
**JEREMY GLOUDEMANS,**
**JOSH NOLTE,**
**WILHELMINA MICKELSON,** and
**JOHN AND JANE DOES,**

> **Defendants.**

---

## DECISION AND ORDER

---

In 2020, the Wisconsin Department of Corrections dismissed veteran correctional officer Stanley L. Felton, Sr., for insubordination and serious misconduct because he tipped off his son about a planned search at Waupun Correctional Institution, where the son was incarcerated at the time. Felton attempted to challenge his termination, but he filed his grievance with the wrong agency. More than two years later, Felton sued the DOC officials involved in his termination, asserting constitutional claims under the First Amendment, the Equal Protection Clause, and the Due Process Clause.

The defendants have moved for judgment on the pleadings, or in the alternative, for summary judgment on each of Felton's claims. In response, Felton abandoned his equal protection claim and one of his due process claims. Because Felton's statement to his son was not constitutionally protected under the First Amendment, the defendants are entitled to judgment on Felton's retaliation claim. Moreover, because the undisputed facts show that

Felton received constitutionally sufficient process both before and after his termination, the defendants are entitled to judgment on Felton's remaining procedural due process claims. The court will therefore grant the defendants' motion.

## BACKGROUND

Stanley Felton, Sr., began his nineteen-year career with the Wisconsin Department of Corrections in 2001. Felton Decl. ¶ 1, ECF No. 65. He was rarely disciplined during his first eighteen years on the job. *See id.* ¶¶ 7–9. However, that all changed in September 2019, when the wrong inmate was released from custody while Felton was the intake sergeant at the Milwaukee Secure Detention Facility. *See id.* ¶ 7; *see also* Compl. ¶¶ 8–10, ECF No. 1. Felton was suspended for three days without pay for his alleged role in the mix-up.

Felton attempted to challenge his suspension according to the DOC's three-step grievance process. Step one required employees to file a grievance with their agency, which for Felton was the DOC. *See* Mickelson Decl. Ex. 1003, ECF No. 54-1. Felton submitted his step-one grievance to the Department of Administration, Division of Personnel Management—that is, where his appeal should have gone at step two of the grievance process. Wilhelmina Mickelson, a human resources officer with the Department of Administration, informed Felton about his mistake and explained the proper steps he needed to follow. She also told Felton that he "must file a Step 1 grievance and get a grievance response back from DOC before [he could] file a Step 2 grievance." Mickelson Decl. Ex. 1003, at 1. Felton eventually submitted a step-one grievance with the DOC and a step-two appeal with the Division of Personnel Management, but he never completed the third and final step—an appeal to the Wisconsin Employment Relations Commission. *See* Felton Dep. 34:21–37:19, ECF No. 51; *see also* Compl. ¶¶ 12–15.

2

On December 28, 2019, Felton was relaxing at home when he received a phone call from his son, G'esa Kalafi (formerly known as Stanley L. Felton, Jr.), an inmate at Waupun Correctional Institution. *See* Mierzejewski Dep. Ex. 2, ECF No. 35-2. After asking his father what he'd been up to, Kalafi indicated that Waupun was on lockdown because a correctional officer had been stabbed. *Id.* at 3:15–4:12. Felton responded, "Yeah, I know. . . . They trying— they trying to get somebody to volunteer to come over there and shake down the place. Man, ain't nobody trying to go over there and shake down. I ain't." *Id.* at 4:3, 4:13–17. Kalafi said they were probably targeting the Northwest building where the stabbing had occurred, noting that no movement was allowed in the South building where he was housed. *Id.* at 4:18–5:6. The conversation continued for another fifteen to twenty minutes, with father and son discussing a range of topics, including sports, church, music, fishing, and Felton's home projects. *See id.* at 5:7–33:10; *see also* Felton Dep. 78:3–8.

Two days later, on December 30, 2019, several DOC officials went to Waupun to assist with searching the housing units for prohibited items. *See* Compl. ¶ 17; *see also* Felton Dep. 42:10–18. Lieutenant Bret Mierzejewski led the search of the South building. *See* Mierzejewski Dep. Ex. 1, ECF No. 35-1. Mierzejewski claims that, while searching Kalafi's cell, he smelled marijuana. *See* Mierzejewski Dep. 12:16–19, ECF No. 35. However, officers did not find any marijuana in Kalafi's cell. *Id.* at 12:20–21. According to Mierzejewski, Kalafi told him that his father had tipped him off that staff were coming to Waupun that day for a shakedown. *See id.* at 8:7–21:15, ECF No. 35; *see also* Mierzejewski Dep. Ex. 1. Kalafi denies telling Mierzejewski that; he claims he merely said, "Everybody knows when a [correctional officer] gets stabbed y'all coming to shake down." Compl. ¶ 18; *see also* Kalafi Decl. ¶ 11, ECF

3

No. 66. Mierzejewski reported his alleged conversation with Kalafi up the chain of command. *See* Mierzejewski Dep. Ex. 1.

Warden Steven Johnson placed Felton on administrative leave pending the outcome of an investigation into whether he had violated DOC rules by tipping off an inmate about an unannounced search. *See* Gloudemans Dep. Ex. 3, at 15, ECF No. 36-3. As part of the investigation, Mierzejewski wrote an incident report about his interaction with Kalafi, which stated in part,

> [Kalafi] conveyed that he had prior knowledge of the searches that were being conducted that day. [Kalafi] stated that his father is an Officer at Milwaukee Secure Detention Facility and that he recently had a conversation where his father told him that there were staff coming to Waupun Correctional to conduct searches on 12-30-2019. Inmate [Kalafi] stated that his father was offered to assist at Waupun Correctional but had turned it down.

Mierzejewski Dep. Ex. 1, at 1. Mierzejewski also listened to the recorded phone conversation between Kalafi and Felton. *See* Mierzejewski Dep. 11:7–21. According to Mierzejewski, the phone conversation confirmed what he says Kalafi told him.

Supervising officers Josh Nolte and Jeremy Gloudemans led the investigation. *See* Defs.' Facts ¶¶ 4–5, ECF No. 58; Johnson Dep. 26:2–8, ECF No. 37. Nolte and Gloudemans listened to the phone conversation and interviewed several witnesses. *See* Gloudemans Dep. Ex. 3, at 17–18. Mierzejewski told the investigators that his conversation with Kalafi was as described in his incident report—that Kalafi said he knew about the shakedown days in advance because he'd been tipped off by his father. *See id.* at 33–34. According to the investigators, Kalafi told them he talked to Felton two days prior to the search, and during that conversation, Felton told Kalafi that he was asked to help with a shakedown at Waupun. *See id.* at 30–31. The investigators also claim that Kalafi admitted to telling other inmates about the imminent search. Kalafi insists that Nolte and Gloudemans fabricated his interview

4

responses. *See* Kalafi Decl. ¶¶ 12–14. During Felton's interview, the investigators played a portion of the recorded phone conversation. *See* Gloudemans Dep. Ex. 3, at 19–22. Felton confirmed it was his voice on the call; however, he denied telling Kalafi confidential information about the planned search.

Felton participated in a pre-disciplinary meeting on January 31, 2020. *See* Gloudemans Dep. Ex. 3, at 25. Prior to the meeting, Nolte and Gloudemans informed Felton that he was accused of insubordination/negligence and serious misconduct for giving his son information about the planned search at Waupun. *See id.* at 45. Felton had representation at the meeting. *See id.* at 25. He told the investigators that he did not intentionally share confidential information with his son. According to Felton, after his son mentioned Waupun being on lockdown, he simply said that the DOC was asking for volunteers to help with a shakedown at the prison. Felton indicated he would take that statement back if he could and that he'd never engaged in similar conduct during his time with the DOC.

The DOC terminated Felton's employment on February 24, 2020, for violating department rules and engaging in serious misconduct. *See* Gloudemans Dep. Ex. 3, at 46–47. The termination letter indicated that Felton told his son about the search two days before it was executed and that his son shared that information with other inmates. The letter further indicated that Felton's actions jeopardized the integrity and effectiveness of the search. And it informed Felton about his right to file a grievance according to the procedures set forth in section 230.445 of the Wisconsin statutes, chapter 430 of Felton's state employee handbook, and DOC Grievance Policy 200.30.303.

Felton attempted to challenge his termination according to the DOC's grievance process. However, as with the grievance of the three-day suspension, he sent the grievance to

5

the wrong agency: on March 10, 2020, Felton emailed a copy of his step-one grievance to the Division of Personnel Management. *See* Mickelson Decl. Ex. 1004, ECF No. 54-2. According to Mickelson, the following day, she emailed Felton back to let him know that his step-one grievance had to be submitted to the DOC. *See id.*; *see also* Mickelson Decl. ¶¶ 6–7, ECF No. 54; Mickelson Dep. 16:14–23:20, ECF No. 38. Felton insists he never received Mickelson's response. *See* Compl. ¶ 27; Pl.'s Facts ¶¶ 30–35, 37–38, ECF No. 63; Felton Decl. ¶¶ 19–20; Felton Dep. 57:16–20, 62:19–69:13, 76:9–22, 87:20–92:18; Figueroa Decl. Ex. F, ECF No. 71-6. According to Felton, he first learned about the filing error in April 2022, when he contacted the DOC to check on his termination grievance and was informed there wasn't any record of an appeal. Pl.'s Facts ¶ 36.

In November 2022, Felton and Kalafi filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that Johnson, Mierzejewski, Gloudemans, Nolte, Mickelson, and unnamed DOC officials violated their constitutional rights in disciplining Felton and ultimately terminating Felton's employment with the DOC. *See* Compl. ¶ 39. The matter was randomly assigned to this court, and all parties consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b). *See* ECF Nos. 3, 6, 20, 77. The court dismissed Kalafi's claim at screening, *see* ECF No. 7, and Felton later found a lawyer to represent him, *see* ECF No. 25. On August 5, 2024, the defendants filed a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment under Rule 56. *See* Defs.' Mot., ECF No. 53; Defs.' Br., ECF No. 57. Felton submitted a brief in opposition to the motion, *see* Pl.'s Br., ECF No. 64, and the defendants submitted a reply brief, *see* Defs.' Reply, ECF No. 76.

## LEGAL STANDARDS

"Rule 12(c) permits a party to move for judgment after the complaint and answer have been filed by the parties." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing Fed. R. Civ. P. 12(c)). "To survive a motion for judgment on the pleadings, 'a complaint must state a claim to relief that is plausible on its face.'" *Denan v. Trans Union LLC*, 959 F.3d 290, 293 (7th Cir. 2020) (quoting *Bishop v. Air Line Pilots Ass'n, Int'l*, 900 F.3d 388, 397 (7th Cir. 2018)). "When assessing the facial plausibility of a claim, '[the court must] view the facts in the complaint in the light most favorable to the nonmoving party and will grant the motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief.'" *Id.* (quoting *Buchanan-Moore*, 570 F.3d at 827).

Under Rule 56, "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *See Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Liberty Lobby*, 477 U.S. at 255).

7

**DISCUSSION**

Felton asserted four claims for relief in his complaint. *See* Compl. ¶ 39. First, he alleged that Mierzejewski, Gloudemans, Nolte, and Johnson violated his First Amendment rights when they tampered with the recorded phone conversation and relied on that conversation to support Felton's termination. Second, he alleged that Johnson violated his right to equal protection when Johnson gave Felton a longer suspension than his white supervisor after the wrong inmate was released from custody. Third, he alleged that Johnson, Mickelson, and other unnamed DOC officials violated his Fourteenth Amendment right to a meaningful appeal concerning his three-day suspension and his termination. Finally, he alleged that Johnson, Mierzejewski, Gloudemans, and Nolte violated his Fourteenth Amendment right to due process when they knowingly falsified records supporting Felton's termination.

The defendants moved for judgment on the pleadings (or for summary judgment) on all four claims. In response, Felton abandoned his equal protection claim and his due process claim concerning the three-day suspension. *See* Pl.'s Br. 4, 13. Felton, however, continues to pursue his other two claims: First Amendment retaliation and a violation of his right to procedural due process concerning his termination. The defendants contend that they did not deprive Felton of his constitutional rights, and even if they did, qualified immunity shields them from liability. The defendants also request sanctions under Rule 11 of the Federal Rules of Civil Procedure.

## I.  The Defendants Are Entitled to Judgment on Felton's First Amendment Retaliation Claim

"The First Amendment, incorporated against the states through the Fourteenth Amendment, shields government employees from retaliation for engaging in protected speech." *Milliman v. County of McHenry*, 893 F.3d 422, 430 (7th Cir. 2018) (quoting *Diadenko*

8

*v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013)). "To survive summary judgment on his First Amendment retaliation claim, [a plaintiff] must produce evidence from which a jury could conclude that he engaged in constitutionally protected speech and that the speech was a substantial or motivating factor in his termination." *Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 925 (7th Cir. 2007) (citing *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996)). The defendants appear to concede that the DOC fired Felton for the statement he made to his son. *See* Defs.' Br. 15–21. Thus, the only element at issue is whether Felton's statement was protected by the First Amendment.

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in promoting effective and efficient public service." *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 792 (7th Cir. 2016) (quoting *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013)). "This last element is known as *Pickering* balancing, after *Pickering v. Board of Education*, 391 U.S. 563, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)." *Swetlik*, 738 F.3d at 825.

## A.    Private citizen

"The Supreme Court has instructed that 'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" *Kristofek*, 832 F.3d at 792–93 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). "However, that speech does not lose protection simply because it 'concerns' or is 'acquired by virtue of [the citizen's] public employment." *Id.* at 793 (quoting *Lane v. Franks*,

9

573 U.S. 228, 240 (2014)). "Rather, the speech itself must 'ordinarily [fall] within the scope of [the plaintiff]'s duties.'" *Id.* "To determine the scope of a public employee's official duties, [courts] look not only to the applicable job description but also to unwritten responsibilities that the employee is expected to perform." *Id.* (citing *Renken v. Gregory*, 541 F.3d 769, 773–74 (7th Cir. 2008); *Vose v. Kliment*, 506 F.3d 565, 570–71 (7th Cir. 2007)).

Here, the undisputed facts demonstrate that Felton's statement to his son was made as a private citizen. Felton was off duty, relaxing at home when he received the call from Kalafi. Although the defendants have not presented evidence of Felton's job description as correctional officer or any of his unwritten responsibilities, accepting a social call from an inmate clearly was not part of Felton's official duties. The fact that Felton's statement related to his job is not dispositive. What matters is whether the DOC "commissioned or created" Felton's statement. *See Kristofek*, 832 F.3d at 793 (quoting *Chrzanowski v. Bianchi*, 725 F.3d 734, 738 (7th Cir. 2013)). It did not. Thus, Felton has satisfied the private-citizen requirement.

### B.    Public concern

"For speech to be constitutionally protected it must also involve a matter of 'public concern.'" *Kristofek*, 832 F.3d at 794 (quoting *San Diego v. Roe*, 543 U.S. 77, 83 (2004) (per curiam)). Speech involves a matter of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "When undertaking public-concern inquiries, [courts] examine the 'content, form, and context' of the statements at issue." *Id.* (quoting *Craig v. Rich Twp. High Sch. Dist. 277*, 736 F.3d 1110, 1115–16 (7th Cir. 2013)). "While none of the three factors is dispositive, content is the most

10

important." *Id.* (citing *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 377 (7th Cir. 2009)).

Felton's statement to his son related to a purely personal issue, not a community one. Kalafi initiated the phone call and told his father that Waupun was on lockdown because a correctional officer had been stabbed. Felton responded saying, "Yeah, I know. . . . They trying . . . to get somebody to volunteer to come over there and shake down the place. Man, ain't nobody trying to go over there and shake down. I ain't." Mierzejewski Dep. Ex. 2, at 4:3, 4:13–17. The statement was made during a private phone conversation between father (a correctional officer with the DOC) and son (a DOC inmate). If not for the DOC investigation, the conversation would have remained in that private forum, with Kalafi the only one to have heard his father's statement. Moreover, Felton was not critical of the DOC's planned search or commenting about any staffing issues at the institution. Rather, he merely confirmed that he knew his son's prison was on lockdown, that the DOC was looking for volunteers to assist with a search, and that he wasn't interested in volunteering. Because Felton's statement related to internal DOC operations and lacked connection to any matter of political, social, or other concern to the community, Felton cannot satisfy the public-concern requirement.

### C.    *Pickering* Balancing

"[F]or speech to be protected under the First Amendment, it must satisfy another requirement: the employee's interest in making the speech must outweigh the employer's interest in 'promoting the efficiency of the public services it performs through its employees.'" *Swetlik*, 738 F.3d at 827 (quoting *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011)). "If not, the employer's action is considered to be justified and does not violate the First Amendment." *Id.* (citing *Garcetti*, 547 U.S. at 418). Courts consider the following

11

factors in balancing the parties' interests:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [his] responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Kristofek*, 832 F.3d at 795–96 (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)). "With respect to the first two factors, the disruptive nature of an employee's speech is so important in the context of law enforcement that a government employer is allowed to consider both the actual *and* the potential disruptiveness." *Id.* at 796 (citing *Lalowski v. City of Des Plaines*, 789 F.3d 784, 791–92 (7th Cir. 2015)).

Several of the above factors favor Felton's interest in expressing his speech. Felton was off duty at the time and in his own home when he accepted the call from his son. Kalafi was the one who initiated the conversation and who first mentioned Waupun being on lockdown. The context of the call reveals that Kalafi—who had been incarcerated for much of his adult life—merely wanted to catch up with his father, who happened to be a correctional officer. Kalafi did not appear to be fishing for confidential information, Felton did not provide any specifics about the planned search, and Kalafi did not ask any follow-up questions. Indeed, Felton seemed to imply that the search would not occur if the DOC couldn't accumulate enough volunteers. And after Felton's brief statement, the conversation continued for another fifteen minutes or so, with no further discussion about the shakedown or any matters touching on Felton's job.

The other factors, however, strongly favor the DOC's interest in promoting effective and efficient public service. First, Felton's statement had the potential to create problems in

12

maintaining discipline and harmony among DOC staff. Other staff members would likely lose trust in Felton if they learned he provided confidential information about an unannounced search to an inmate, and they would likely lose faith in the department if Felton's conduct went unpunished. Second, and relatedly, personal loyalty and confidence are paramount within the DOC, and Felton's statement to his son violated those demands. His statement also jeopardized the potential effectiveness of the search by giving inmates a chance to discard contraband. Third, Felton's statement directly conflicted with his responsibilities as a correctional officer and placed his loyalty to his son above the security interests of the DOC. Finally, although Felton was off duty at the time, he was not speaking purely as a member of the general public, as he divulged confidential information he learned in his role as a correctional officer.

Felton's attempts to tip the scale in his favor fall short. He points out that only he and his son were privy to the phone call, and Kalafi insists that he never shared the information with other inmates. If actual disruptiveness were required, those disputed facts may preclude summary judgment. But the Seventh Circuit has said that "a government employer is allowed to consider 'the potential disruptiveness' of the employee's speech," *Lalowski*, 789 F.3d at 791 (quoting *Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999)), and Felton's statement clearly created at least a *potential* for disruption within the DOC. Felton also says that the DOC routinely informs inmates about upcoming searches in an effort to have inmates voluntarily give up their contraband. That appears to be true. *See* Kalafi Decl. Ex. A, ECF No. 66-1. However, Felton acknowledged during his deposition that the DOC also performs unannounced searches and that confidentiality is key in those situations. *See* Felton Dep. 44:18–46:10. Lastly, Felton adamantly denies telling Kalafi when the search was going to

happen. In fact, Felton claims that, because he refused to volunteer, he didn't know any details about the search or if it would happen at all. I agree that Felton's statement was quite vague; he merely told Kalafi that the DOC was trying to get volunteers to help with a shakedown at Waupun, and he never mentioned when the search was to go down. But given that a correctional officer had just been stabbed at that institution, Kalafi reasonably would have inferred that the planned search was imminent. And any advance notice—whether the inmates knew the exact day or time—could compromise the integrity of the search by allowing inmates to discard contraband. Thus, even if Felton had spoken on a matter of public concern, his First Amendment retaliation claim would not survive, as the DOC's interest in running an efficient and effective prison outweighed Felton's interest in speaking out.

*      *      *

In sum, because Felton's statement during the phone conversation with his son was not constitutionally protected under the First Amendment, the defendants are entitled to judgment on Felton's retaliation claim.

## II.   The Defendants Are Entitled to Judgment on Felton's Due Process Claims

"The Due Process Clause of the Fifth and Fourteenth Amendments prohibits deprivation of life, liberty, and property without due process of law." *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Matamoros v. Grams*, 706 F.3d 783, 789 (7th Cir. 2013)). Felton asserts that the defendants deprived him of his state employment without due process of law. "To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is '(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process.'" *Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010) (quoting *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004)). The defendants

14

appear to concede that Felton had a protected property interest in his continued employment as a correctional officer and that the DOC deprived Felton of that property interest. *See* Defs.' Br. 12. Thus, the only issue is whether the defendants satisfied the constitutional demands of due process in depriving Felton of his employment.

"Due process is a flexible concept which 'calls for such procedural protections as the particular situation demands.'" *Buttitta v. City of Chicago*, 9 F.3d 1198, 1201 (7th Cir. 1993) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). "The cornerstone of due process is notice and the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 571 (7th Cir. 2017) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). Courts must balance three factors in considering what process is due in a specific situation: "first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of additional procedural safeguards; and third, the government's countervailing interests." *Simpson v. Brown County*, 860 F.3d 1001, 1006 (7th Cir. 2017) (citing *Mathews*, 424 U.S. at 335).

Here, Felton asserts that he was denied procedural protections before and after his termination. "Public employees who have a property interest in their continued employment are entitled to both pre-termination and post-termination hearings." *Griffin v. Bennett*, No. 04-C-512, 2006 WL 44301, 2006 U.S. Dist. LEXIS 2026, at *7 (E.D. Wis. Jan. 6, 2006) (citing *Gilbert v. Homar*, 520 U.S. 924, 929 (1997)); *see also Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 503 (7th Cir. 1999). "Because the adequacy of pre-termination procedures is dependent upon the extent of post-termination procedures," *Michalowicz v. Village of Bedford Park*, 528 F.3d 530, 534 (7th Cir. 2008) (citing *Swank v. Smart*, 898 F.2d 1247, 1256 (7th Cir. 1990)), I will first

15

address Felton's claim that he wasn't provided a meaningful opportunity to appeal his termination.

## A. Post-termination process

The defendants argue that Felton's due process claim fails as a matter of law because he did not complete the grievance procedure outlined in his employee handbook. "Grievance procedures created by collective bargaining agreements can satisfy the requirements of due process for terminated employees." *Hudson*, 374 F.3d at 563 (citing *Buttitta*, 9 F.3d at 1206; *Winston v. U.S. Postal Serv.*, 585 F.2d 198, 209–10 (7th Cir. 1978)). "Where an employee merely declines or fails to take advantage of an administrative procedure that the state employer has made available to him, the state cannot be held to have violated due process requirements." *Wood v. Peoria Sch. Dist. 150*, 162 F. Supp. 3d 786, 795 (C.D. Ill. 2016) (citing *Dusanek v. Hannon*, 677 F.2d 538, 543 (7th Cir. 1982)).

The Wisconsin Human Resources Handbook lays out a three-step grievance procedure state employees must use in contesting an adverse employment decision. *See* Wisconsin Human Resources Handbook, Ch. 430, §§ 430.080, 430.090 (last revised Aug. 2022), *available at* https://dpm.wi.gov/Hand%20Book%20Chapters/WHRH_Ch_430.pdf; *see also* Wis. Stat. § 230.445. The employee must first file a grievance with the appointing authority of his agency within fourteen calendar days from the date he first became aware of the matter being grieved. The appointing authority may investigate and meet with the employee in person and must issue a written decision within fourteen days of receiving the grievance. If a grievance is denied at step one, or if the appointing authority fails to issue a written decision within fourteen days, the employee may proceed to step two—an appeal to the Department of Administration, Division of Personnel Management. Step-two grievances must be filed with

16

fourteen days from the date of decision in step one or within fifteen calendar days of the date on which the grievance should have been answered. Grievances not resolved or settled at step one or step two of the process may be appealed to the Wisconsin Employment Relations Commission.

It is undisputed that Felton did not complete the three-step grievance procedure. Felton was supposed to first file his termination grievance with the DOC; however, on March 10, 2020, he emailed the grievance to the Division of Personnel Management—that is, where his appeal should have gone at step two of the grievance process. *See* Mickelson Decl. Ex. 1004. Felton did not correct his mistake, and he never filed a step-two or step-three appeal.

The parties dispute whether Felton was informed about his filing error. Mickelson (at the time a human resources officer with the Department of Administration) says she explained the mistake in an email she sent Felton on March 11, 2020. *See* Mickelson Decl. ¶¶ 6–7; Mickelson Dep. 16:14–23:20. However, the email the defendants first produced in discovery suggested it was sent on October 18, 2023:

| | |
|---|---|
| **From:** | Mickelson, Wil - DOA |
| **To:** | felton.stanley@yahoo.com |
| **Subject:** | FW: Stanley Felton shared a photo with you |
| **Date:** | Wednesday, October 18, 2023 4:09:28 PM |
| **Attachments:** | image001.png |

*See* Polich Decl. Ex. 1010, at 9, ECF No. 75-4. After noticing the discrepancy, the defendants produced the original email in both native and PDF format and explained that the date must have autocorrected to the date it was forwarded to defense counsel by the Department of Administration:

17

| From: | Mickelson, Wil - DOA |
| To: | felton.stanley@yahoo.com |
| Subject: | FW: Stanley Felton shared a photo with you |
| Date: | Wednesday, March 11, 2020 7:28:00 AM |

Attachments: image001.png

Mickelson Decl. Ex. 1004. Felton insists that he did not receive Mickelson's response in March 2020. *See* Compl. ¶ 27; Pl.'s Facts ¶¶ 30–35, 37–38; Felton Decl. ¶¶ 19–20; Felton Dep. 57:16–20, 62:19–69:13, 76:9–22, 87:20–92:18. He claims that he first saw Mickelson's email in October 2023 when it was produced in discovery. *See* Felton Decl. ¶ 19.[1]

Ultimately, the dispute over the Mickelson termination email is immaterial. Three months prior to attempting to challenge his termination, Felton filed a grievance regarding his three-day suspension. Like the termination grievance, Felton submitted his suspension grievance to the wrong agency (the Division of Personnel Management). *See* Mickelson Decl. Ex. 1003. It is undisputed that Mickelson informed Felton that he had to submit step-one grievances to the DOC. *See* Felton Dep. 33:6–34:20, 69:3–7. Also, the termination letter referenced the grievance procedure outlined in the employee handbook, including filing an initial grievance with the DOC. *See* Gloudemans Dep. Ex. 3, at 46–47. Felton therefore should have known how to properly file his termination grievance. Because Felton was familiar with the grievance procedure, it is immaterial whether he was informed about his own filing error—compliance was his responsibility. Moreover, Felton does not explain why he waited so long to check on the status of his termination grievance. *See id.* at 68:21–69:13. The DOC had just fourteen days to issue a written decision on the grievance. Felton, however, didn't follow up

---

[1] At times, Felton goes so far as to claim that Mickelson or someone with access to her email account (Mickelson has long retired from the DOC) sent him the email on October 18, 2023. *See* Pl.'s Br. 13–17 (citing Felton Decl. ¶¶ 19–20). But Felton's attorney says she went through his email history and didn't locate any correspondence from Mickelson. *See* Figueroa Decl. Ex. F.

until April 2022—more than two years later. He should have known that something was amiss.[2]

Accordingly, the undisputed evidence shows that Felton had a meaningful opportunity to appeal his termination. The grievance procedure outlined in the employee handbook provides adequate post-deprivation process, and Felton failed to fully avail himself of those procedural protections. *See Dusanek*, 677 F.2d at 543 ("[A] state cannot be held to have violated due process requirements when it has made procedural protection available and the plaintiff has simply refused to avail himself of them.").

### B. Pre-termination process

Felton also challenges the pre-termination disciplinary process. He accuses defendants Johnson, Mierzejewski, Gloudemans, and Nolte of misrepresenting the contents of the phone conversation he had with his son. (Felton actually accuses those defendants of *falsifying* the evidence, but mispresenting is a better verb to describe his accusation.) In his incident report, Mierzejewski indicated that Kalafi told him "he recently had a conversation where his father told him that there were staff coming to Waupun Correctional to conduct searches on 12-30-2019." Mierzejewski Dep. Ex. 1, at 1. Mierzejewski also claimed that the phone conversation confirmed what he says Kalafi told him. *See* Mierzejewski Dep. 11:7–21. Gloudemans and Nolte repeated Kalafi's alleged statement to Mierzejewski in their investigative summary, and Johnson referenced that statement in his termination letter. *See* Gloudemans Dep. Ex. 3, at 26, 46. (I say alleged because Kalafi denies snitching on his father to Mierzejewski.) However,

---

[2] The defendants maintain that the dispute over the Mickelson termination email is also immaterial because the handbook says that a grievance can be appealed regardless of whether the DOC issues a written decision. But the Mickelson suspension email directly contradicts that statement, as Mickelson told Felton that he "must file a Step 1 grievance *and get a grievance response back from DOC before [he could] file a Step 2 grievance.*" Mickelson Decl. Ex. 1003, at 1 (emphasis added).

19

the undisputed evidence shows that Felton did not mention any dates during the phone conversation; he merely said that the DOC was trying to get volunteers to assist with a shakedown at Waupun. *See* Mierzejewski Dep. Ex. 2, at 4:13–17. Felton says that, by distorting his words, the defendants deprived him of an impartial decision maker.

Because Felton received constitutionally adequate post-deprivation process, the required pre-deprivation procedural protections were minimal. "[W]hen adequate post-termination proceedings exist, a pre-termination hearing need only provide 'an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action.'" *Michalowicz*, 528 F.3d at 536–37 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545–46 (1985)). "In [this] truncated form, 'pre-termination process need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story.'" *Id.* at 537 (quoting *Gilbert*, 520 U.S. at 929).

The undisputed facts show that Felton received adequate pre-deprivation process. Felton acknowledges that he was provided written notice of the charges against him and an explanation of the DOC's evidence. *See* Pl.'s Br. 14. Nolte and Gloudemans informed Felton that he was accused of insubordination and serious misconduct for allegedly telling a Waupun inmate on December 28, 2019, about a planned search at the prison. *See* Gloudemans Dep. Ex. 3, at 45. They also notified Felton about his pre-disciplinary meeting and informed Felton that he had a right to representation at the meeting. Felton and his representative appeared in person at the meeting two days later, and Felton was provided an opportunity to tell his side of the story. *See* Gloudemans Dep. Ex. 3, at 25. Although it doesn't appear that Felton accused

the investigators of misrepresenting the contents of the phone conversation, he did insist that his son initiated the call, that his son first mentioned Waupun being on lockdown, and that he simply told his son that the DOC was asking for volunteers to help with a shakedown. In other words, Felton had a chance to emphasize at the meeting that during the phone conversation he didn't provide his son any specifics about the planned search. The fact that the DOC continued to rely on that conversation as the basis for Felton's termination does not show that the proceedings were biased against him. Specific or not, Felton's sharing of confidential information with an inmate constituted a serious violation of DOC rules.

*   *   *

In sum, because the undisputed facts show that Felton received constitutionally sufficient process both before and after his termination, the defendants are entitled to judgment on Felton's remaining due process claims.

## III. Qualified Immunity Shields the Defendants from Liability on Felton's Claims

"For civil damages claims under 42 U.S.C. § 1983 for violations of constitutional rights, the doctrine of qualified immunity 'shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Muhammad v. Pearson*, 900 F.3d 898, 903 (7th Cir. 2018) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam)). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Mullenix*, 577 U.S. at 12). "To overcome a defendant's invocation of qualified immunity, a plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* (quoting *Green v. Newport*, 868 F.3d 629, 633 (7th Cir. 2017)). "If the answer to either question

is no, the defendant official is entitled to qualified immunity." *Id.* at 904 (citing *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014)).

Felton has failed to demonstrate that the defendants violated his clearly established rights. He does not address the defendants' argument that they are immune from liability on his due process claims. *See* Pl.'s Br. 17–19. As to his retaliation claim, Felton says that courts "have long recognized that an employer may not retaliate against an employee for expressing his views about matters of public concern." Pl.'s Br. 18 (citing *Gorman vs. Robinson*, 977 F.2d 350, 355 (7th Cir. 1992)). That may be true. But "[t]he Supreme Court has instructed that 'clearly established law should not be defined at a high level of generality.'" *Green*, 868 F.3d at 633 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). "While a case directly on point is not required, 'the clearly established law must be particularized to the facts of the case." *Ibid.* Felton has not identified, and the court has not found, an instance in which prison officials were found to have violated an employee's First Amendment rights by punishing him for disclosing confidential security information. Nor is such a violation obvious. Accordingly, the defendants would be entitled qualified immunity on Felton's remaining claims, even if they had violated his constitutional rights.

## IV.   The Court Declines to Sanction Felton and/or His Attorney

In their reply brief, the defendants request sanctions against Felton and his lawyer under Rule 11. *See* Defs.' Reply 1–8. The defendants insist that all Felton's claims are frivolous. They also accuse Felton of making knowingly false statements in interrogatories and providing false testimony at his deposition and in his declaration opposing summary judgment. Their main beef is Felton's assertion that he didn't receive the Mickelson termination email until October 2023 and his insinuation that the defendants doctored the

evidence to make it seem it had been sent in March 2020. *See* Pl.'s Br. 16 ("The evidence suggests Mickelson never pressed 'send' on the email until three and a half years after she retired, which could only mean so [sic] unethical business on defendants' behalf was going on."). According to the defendants, that assertion is demonstrably false, as Felton claims he did not find any correspondence from Mickelson when he searched through his email history.

The court denies the defendant's request for sanctions. Rule 11 requires that a motion for sanctions "be made separately from any other motion." Fed. R. Civ. P. 11(c)(2). Requesting sanctions in a summary judgment reply brief is procedurally improper. *See Divane v. Krull Elec. Co.*, 200 F.3d 1020, 1025 (7th Cir. 1999) ("Permitting a motion for sanctions to be made in conjunction with another motion constitutes an abuse of discretion."); *Life Crunch Inc. v. Johansen*, 675 F. Supp. 3d 889, 897–98 (N.D. Ill. 2023) (denying as procedurally improper a request for Rule 11 sanctions that was included as an alternative basis to support a fee motion); *Brown v. Salvation Army, Ray & Joan Kroc Corps Cmty. Ctr.*, 60 F. Supp. 3d 971, 982 (N.D. Ind. 2014) (denying as procedurally improper a request for Rule 11 sanctions that was included in a response to a motion to amend); *Franklin v. Beth*, No. 05-C-0916, 2007 WL 325800, 2007 U.S. Dist. LEXIS 7498, at *10–11 (E.D. Wis. Jan. 31, 2007) (denying as procedurally improper a request for Rule 11 sanctions that was included in a response to a motion to dismiss). And the court declines to issue sanctions on its own under these circumstances. *See* Fed. R. Civ. P. 11(c)(3).

## CONCLUSION

In sum, Felton's general belief that his employer overreacted to a single, somewhat vague phone call with his son is not unreasonable. But courts are not superpersonnel departments sitting in judgment of the wisdom of an employer's decision. *Blise v. Antaramian,*

409 F.3d 861, 867 (7th Cir. 2005). The question is whether the employer's decision violated the Constitution, and it didn't. Felton's phone conversation with his son was not constitutionally protected under the First Amendment, and Felton received constitutionally sufficient due process before and after his termination. Accordingly, for all the foregoing reasons, the court **GRANTS** the defendants' motion for judgment on the pleadings or in the alternative for summary judgment, ECF No. 53. The clerk of court shall enter judgment that this action is dismissed and that Felton shall take nothing from the defendants by his complaint.

      **SO ORDERED** this 12th day of December, 2024.


_____
STEPHEN C. DRIES
United States Magistrate Judge

24